**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>       Plaintiff, )<br>       )<br>  v. )<br>       )<br>PATRICIA CARRINGTON, )<br>       Defendant. ) | CAUSE NO.: 2:19-CR-59-PPS-JPK |

## OPINION AND ORDER

This matter is before the Court on a Motion to Reconsider Bond [DE 83], filed by Defendant Patricia Carrington. The motion seeks reconsideration of this Court's May 29, 2019 Order of Detention (ECF No. 25) based on new information concerning certain medical conditions which Carrington contends place her at higher risk of severe illness amid recent COVID-19 infections at Porter County Jail, where she is currently detained. Specifically, Carrington offers a January 2019 medical record noting diagnoses of COPD (Chronic Obstructive Pulmonary Disease), asthma, emphysema, bronchitis, and congestive heart failure. (ECF No. 83, at 1-2 (citing ECF No. 85)). Pursuant to 18 U.S.C. 3142(i), the motion seeks Carrington's temporary release "with whatever bond conditions the court deems necessary," and proposes she reside with her sister in Gary, Indiana. (ECF No. 83, at 6).

With Carrington's agreement, the Court allowed expedited briefing and set a video teleconference hearing on April 27, 2020. (ECF No. 88). That briefing revealed that Carrington has now tested positive for COVID-19 and is being treated and monitored in custody. (ECF Nos. 93, 95). Having considered the parties' briefs and the evidence and argument presented at the April 27 hearing (ECF No. 97), the Court now **DENIES** Carrington's request for temporary release for the following reasons.

## BACKGROUND

I.    **The Pending Charges**

On April 16, 2019, the government charged Carrington with kidnapping in violation of 18 U.S.C. § 1201, which carries a maximum possible penalty of life in prison. (ECF No. 1). The affidavit accompanying the criminal Complaint alleges a rather horrific series of events during which Carrington and two of her sons (Jaron and Jarod Johnson)[1] kidnapped a victim in an effort to coerce her to reveal the whereabouts of her sister. (ECF No. 1-1). The kidnapping allegedly occurred just before the victim's sister was set to testify against Jarod for shooting her while she was pregnant and attempting to murder her and her boyfriend. (*Id.*).

According to the Affidavit, the victim was kidnapped as she was walking home from work. (*Id*. at ¶ 5). Jaron forced the victim into a vehicle after hitting her in the back of the head with a handgun, while Carrington assisted by opening one of the vehicle doors so the victim could not escape. (*Id*.). After the victim was forced into the vehicle, Carrington took the victim's cell phone and tore her shirt to ensure she had no other cell phones, while Jaron pointed two handguns at the victim. (*Id*. at ¶ 6). Jaron duct taped the victim's hands behind her back, and Carrington placed a sock over the victim's eyes and duct taped it to her head. (*Id*.). Carrington then took part in the central purpose of the kidnapping: interrogating the victim about her sister's location. (*Id*. at ¶¶ 7-8). Carrington pulled the victim's hair, and the victim was beaten and choked when she refused to answer. (*Id*. at 8, 11). Carrington then gave directions to their final location, where Jarod pulled the victim out of the vehicle and forced her to walk forward. (*Id*. at ¶ 12). The victim felt Carrington speak directly into her ear as she cursed at the victim just before the victim was shot in the face. (*Id*. at ¶ 13). After the shooting, while the victim was lying on the ground, she heard Carrington

---

[1] To avoid confusion, the Court will use first names for Jaron and Jarod Johnson when they are referenced below.

say "Let's go." (*Id*.). But Jarod then said, "No Ma, No ma. She's playing dead. She's not dead." (*Id*.). The victim then heard four or five more gunshots and felt one bullet graze her arm. (*Id*.).

All of this is recounted by the victim; it constitutes only allegations at this time. The Court is mindful that Carrington is presumed innocent. Nevertheless, the victim's story is partially corroborated by an ankle monitor Jarod was wearing as part of the terms of release on his pending attempted murder charges, which placed him in the area where the shooting allegedly occurred. (*Id*. at ¶ 15). FBI Agents also recovered duct tape, dried blood, and spent shell casings where the victim reported she was left, and video from a doorbell camera shows the victim asking for help in the same area. (*Id*. at ¶¶ 16-17). The victim also claims she had known Carrington, Jarod, and Jaron for about five years before the kidnapping and could identify them and their voices. (*Id*. at ¶ 10). The victim further identified Carrington, Jaron, and Jarod in a photographic line up, though she did not identify a fourth individual who law enforcement believe was also involved. (*Id*. at ¶¶ 19-20).

## II.     Carrington's Initial Detention Hearing

The government moved for detention at Carrington's initial appearance, she was later indicted with substantially identical charges, and a detention hearing was held at the time of her arraignment. (ECF Nos. 7, 13, 23, 70-71). The government's detention request relied on § 3142(f)(1)(B), for charges that carry a potential life sentence; § 3142(f)(1)(E), for charges involving possession or use of a firearm; and § 3142(f)(2), for cases involving "serious risk" the defendant will flee or "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." (ECF No. 71, at 13, 16). As to the latter, the government argued the very offense charged (a kidnapping aimed at finding the whereabouts of a witness) demonstrates the danger Carrington will "obstruct or attempt to

3

obstruct justice, or attempt to threaten, injure, or intimidate, a prospective witness," and proffered facts consistent with the criminal Complaint, but with greater detail concerning the beating of the victim during the kidnapping. (*Id*. at 7-11). The government offered to provide a witness for cross examination as to these facts, and also concurred with a Pretrial Services Report (ECF No. 18) concluding that Carrington poses both a risk of flight and danger to the community in light of her criminal history (including a handgun-related charge); mental health issues; social issues; and lack of employment. (ECF No. 71, at 12-14).

Carrington also proceeded by proffer. She asserted certain medical needs unmet in custody, but not precisely those currently at issue, which of course took on new light as COVID-19 started to spread. (ECF No. 71, at 11-12). Carrington's counsel also argued she was a lifelong resident of Northwest Indiana with two dependent daughters (then ages 14 and 16), and proposed electronic monitoring, drug testing, and mental health counseling as conditions of release. (ECF No. 71, at 11-12, 15).

After weighing the factors set forth in § 3142(g), the Court determined that no conditions or combination of conditions would reasonably assure the safety of the community. (*Id*. at 16-19). While the facts considered by the Court and its reasons for detention (then and now) are reviewed and more thoroughly discussed below, the Court's initial determination focused heavily on the nature of the instant offense and Carrington's danger to the community. Among other factors, the Court found the charge of kidnapping and violent efforts to locate and threaten a witness in a pending criminal case were strongly indicative of Carrington's danger to the community, and that no condition or combination of conditions could reasonably assure the safety of the victim in this case or other potential witnesses. (*Id*.). The strength of the evidence against Carrington, proffered by the government and corroborated by other facts, also weighed in favor of detention. (*Id*.). And

while Carrington's ties to the community might have mitigated the risk of her nonappearance, they failed to address her danger to the community or the feasibility of any condition to address it, including location monitoring, which had already failed to prevent the instant offense. (*Id*.). Similarly, the Court found any medical issues not being addressed in custody likewise unrelated to the issue of whether any conditions might reasonably assure the safety of the community or Carrington's continued appearance, and instead an issue that should be addressed by the detention facility, or the Court, if and when necessary. (*Id*.).

### III.   Proceedings on the Instant Motion

As initially filed, Carrington's Motion to Reconsider Bond (ECF No. 83) argued that the current COVID-19 pandemic, in combination with confirmed cases of COVID-19 at her place of detention and her particular medical conditions, amount to a compelling reason for her temporary release under § 3142(i). Now that Carrington has tested positive for the virus, she seeks release "so she can receive better medical care on the outside of the jail." (ECF No. 95, at 1). She argues her "serious respiratory issues" put her in a "high risk category" for a more severe reaction to the virus, and she would have access to better medical treatment, including a ventilator if needed, outside the jail. (*Id*. at 1-2). Carrington again proposes home confinement with her sister, who she says remains willing to have Carrington stay with her even after learning she has now contracted the virus. (*Id*.). At the April 27 hearing, Carrington's counsel indicated that she would stay at her sister's home with her sister, nephew, and brother-in-law.

The government opposes Carrington's motion, arguing that her medical issues fail to overcome the more compelling grounds for her detention, and that "[n]o conditions seem reasonably likely to reduce the risk to witnesses and the community." (ECF No. 93, at 5-6). The government also disputes Carrington's claim that she would receive better medical care if released

(for COVID-19 or her mental health issues) and notes her failure to provide any supporting evidence in that regard. (*Id*. at 7-8). According to the government, there is no longer any medical imperative to release Carrington "to avoid exposure to a virus she has already contracted," and doing so now would only heighten the risk of community spread, "as Carrington could infect those she lives with and anyone else with whom she or they have close contact." (*Id*.).

Yesterday, this Court conducted a hearing on Carrington's motion. The Court also heard testimony from a Porter County Jail Captain – Captain Taylor, the third highest ranking officer at that facility, who is responsible for assuring that inmates detained there are in a safe environment and receive appropriate medical care. According to Captain Taylor, 40 out of 210 inmates at Porter County Jail are currently infected with COVID-19, and numerous procedures have been implemented to contain further spread of the virus. To begin, new inmates are subject to a 14-day quarantine before they are admitted into the general population. Additionally, cleaning of all common living areas has been increased, with all such areas, tables, shared bathrooms, showers, etc. disinfected twice a day (in the afternoon and again overnight). Inmates have also been provided cleaning supplies to disinfects their cells; additional soap to allow for increased handwashing; and guidelines from the Indiana State Department of Health regarding symptoms of the virus, social distancing, and other precautionary measures to reduce its spread. The jail has also closed its kitchen and now provides inmates with packaged meals to reduce handling of food and trays within the facility. Officers are also relying more upon visual surveillance so they have less interaction and are therefore less likely to spread the virus between living areas.

In terms of medical care, the jail has at least one nurse (RN or LPN) on staff at the prison 24 hours a day, and two to three nurses (a combination of RNs and LPNs) during the day. Staff conduct visual checks and temperature checks of every inmate daily, and inmates who have

exhibited symptoms or tested positive for COVID-19 are isolated and have their temperature and symptoms checked and logged twice a day. A doctor visits the jail once a week, and is seeing inmates who have tested positive for COVID-19. If an inmate feels their COVID-19 symptoms are worsening, they may use an intercom call button to notify an officer and request to see a nurse. The nursing staff is also prescribing Tylenol for fever and Mucinex or other medications for cough-related symptoms. Inmates may also notify a nurse of a breathing issue and have their oxygen levels checked to assure they remain in a safe range. If an inmate develops a more serious breathing issue, the doctor is notified and/or a hospital is involved. As of yesterday's hearing, only one inmate had developed a more serious breathing issue and was hospitalized when her oxygen levels became a concern. According to Captain Taylor, there was no delay in hospitalizing that inmate when her symptoms worsened, and she was still hospitalized but now doing well.

Having tested positive, Carrington is isolated under quarantine with five other inmates in a 16-person cell block, so they have room to social-distance and are wearing masks. (According to Captain Taylor, the jail is less crowded generally, with inmate population down about 33% since the first of the year.) Captain Taylor also confirmed that Carrington has access to an intercom call button to ask for a nurse 24 hours a day. Regarding Carrington's medical care, Captain Taylor reported that she has been monitored for COVID-19 symptoms since April 17, when she initially registered a temperature of 99.8, but has had a normal temperature since that day. Carrington also reported a cough on April 17, 18, 23, and 24, but no other symptoms have been documented during her twice daily checks.

By proffer, Carrington reported that she has additional symptoms, including body cramps and numbness in her gumline, and has yet to see a doctor since testing positive for COVID-19. But Carrington also confirmed she has a prescription for an inhaler twice a day, has been able to ring

for the nurse when she feels the need to use it, and the nurse has responded within ten minutes. While Carrington complained the nurse does not always provide the inhaler, her proffer also gave a reason for that: the nurse takes her oxygen levels to determine if the inhaler is needed before providing it.

Having considered this evidence and the arguments of counsel, the Court agrees with the government that Carrington has failed to demonstrate a compelling reason necessary for her release. The Court therefore grants Carrington's motion only insofar as it requests reconsideration of her detention and denies her request for release, for the reasons explained below.

## ANALYSIS

### I.     The Statutory Framework

The Bail Reform Act requires a court to hold a detention hearing upon motion by the government in two instances: (1) when the case involves one of the offenses enumerated in subsection (f)(1), such as one carrying a potential life sentence, or possession or use of a firearm; or (2) when there is serious risk the defendant will flee or obstruct justice, as described in subsection (f)(2). 18 U.S.C. § 3142(f)(1)(B), (E) and (f)(2)(A), (B). In such cases, a hearing is required "to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." *Id*. at § 3142(f). After the hearing, § 3142(e) requires detention if the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." The government bears the burden on both issues, by a preponderance as to risk of nonappearance and by clear and convincing evidence as to danger to the community. *Id*. at § 3142(f)(2).[2]

---

[2] The government conceded during Carrington's initial detention hearing that there was no rebuttable presumption of detention. (ECF No. 71, at 6-7).

8

Section 3142(g) lists the factors to be considered when determining whether any conditions of release might reasonably assure the defendant's appearance and the safety of the community:

> (1) the nature and circumstance of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including-
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Equally pertinent here, § 3142(f) also allows for reopening a detention hearing "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." The Court regards Carrington's newly submitted information regarding her medical condition and recent COVID-19 infection as bearing on that issue, at least to some extent. The Court therefore grants Carrington's Motion to Reconsider Bond insofar as it seeks consideration of that new information in relation to the issue of detention under § 3142(f), and undertakes that analysis below. As other courts have observed, however, the determination under § 3142(f) "focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the

community." *United States v. Clark*, – F. Supp. 3d –, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). "The risk of harm *to the defendant* does not usually bear on this analysis." *Id.* (emphasis in original); *U.S. v. Calvert*, No. 19-40068, 2020 WL 1847754, at *2 (D. Kan. Apr. 13, 2020) (collecting decisions following *Clark*).

That said, some courts have considered COVID-19 in their analysis under § 3142(f) to the extent it bears on any of the factors set out in § 3142(g), such as the history and characteristics of the defendant. *E.g.*, *United States v. Leake*, No. 19-cr-194, 2020 WL 1905150, at *2 (D.D.C. Apr. 17, 2020); *United States v. Hussein*, No. 29-mj-89, 2020 WL 1853656, at *3 (D. Minn. Apr. 13, 2020). Courts have also considered the pandemic insofar as it bears more generally "on whether conditions of release can be fashioned to assure the appearance of the defendant as required and the safety of the community." *E.g.*, *United States v. Duckett*, No. 19-cr-229, 2020 WL 1904745, at *4 (D. Md. Apr. 17, 2020); *United States v. Green*, No. 1:19-cr-539, 2020 WL 1873967, at *1 (D. Md. Apr. 15, 2020) (citing *United States v. Martin*, – F. Supp. 3d –, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020)). As explained below, this Court does the same.

In addition to such considerations under § 3142(f), "many courts have found that the determination of whether a defendant's circumstance warrants temporary release due to COVID-19 is more suitably considered on a case-by-case basis under § 3142(i)'s 'compelling reason' grounds." *E.g.*, *United States v. Hanson*, No. 19-132, 2020 WL 1692967, at *2 (D. Mont. Apr. 7, 2020) (citing *Clark*, 2020 WL 1446895, at *3); *see also United States v. Hernandez*, No. 3-19-CR-346, 2020 WL 1876102, at *2 (N.D. Tex. Apr. 14, 2020) (collecting decisions). Under this provision, a court "may" permit "temporary release" of a defendant "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Prior to the COVID-19 pandemic, defendants

10

seeking release under subsection (i) typically did so for reasons relating to defense preparation, but courts also granted such relief "sparingly" under the "compelling reason" prong where a defendant had a serious illness or injury. *United States v. Andrewsh*, No. 5:19-mj-87, 2020 WL 1904473, at *4 (M.D. Penn. Apr. 17, 2020) (quoting *United States v. Lee*, No. 19-CR-298, 2020 WL 1541049, at *3 (D.D.C. Mar. 30, 2020)); *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020)). More recently, a "growing number of jurisdictions" have considered requests for release relating to COVID-19 under the "compelling reason" prong of § 3142(i). *Hernandez*, 2020 WL 1876102, at *3 (collecting decisions).

As these decisions recognize, the defendant bears the burden of demonstrating a sufficient ground for release under § 3142(i). *Id.*; *Andrewsh*, 2020 WL 1904473, at *3. Even where such a ground exists, however, release under § 3142(i) is subject to the court's discretion, as the provision states that a court "may" release a defendant as necessary for defense preparation or another compelling reason, not that release is required for such reasons. *United States v. Gumora*, No. 20-CR-144, 2020 WL 1862361, at *9 n.10 (S.D.N.Y. Apr. 14, 2020); *United States v. Davis*, No. 2:19-cr-74, 2020 WL 1951652, at *1 (N.D. Ind. Apr. 23, 2020). Courts considering motions under § 3142(i) also agree that the determination of whether to release a defendant under that subsection requires an "individualized" analysis of the facts of each case. *Gumora*, 2020 WL 1862361, at *5; *Andrewsh*, 2020 WL 1904473, at *4; *Hussein*, 2020 WL 1853656, at *4. When addressing motions seeking release due to concerns over COVID-19, many courts have considered four factors articulated in *United States v. Clark* to guide that analysis: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would

11

increase COVID-19 risks to others." *See Davis*, 2020 WL 1951652, at *1 (quoting *Clark*, 2020 WL 1446895, at *3).³ As discussed below, this Court considers these factors helpful when considering the text of the statue and therefore considers them as well.

It is worth noting that Carrington moved under only § 3142(i). By its very nature, expedited briefing allows less time for development of the legal issues, and the Court appreciates the very helpful and persuasive arguments of both defense counsel and the AUSA. However, the Court will not cabin its review to § 3142(i). Since Carrington argues "the circumstances that existed when [she] was ordered detained have now changed" and even suggests that she now has greater incentives to abide by conditions of release (ECF No. 83, at 4-6), the Court will first treat this as a motion to reopen the detention hearing based on evidence not known to Carrington at the time of the initial hearing, and potentially bearing upon whether there are any conditions or combination of conditions that would reasonably assure her appearance as required or the safety of the community or any other person. This requires the Court to reconsider this threshold issue of detention or possible conditions of release under § 3142(f). While somewhat related, the question of whether § 3142(i) calls for temporary release deserves its own analysis. And, of course, if § 3142(f) no longer calls for detention, there is no reason to consider § 3142(i).

## II.     Section 3142(f)

With the facts contained in the criminal Complaint, and the potential for Carrington to serve a life sentence, the charges against her are among those "most serious of crimes" for which the Bail Reform Act permits detention. *United States v. Salerno*, 481 U.S. 739, 747 (1987). Specifically, as noted above, the crime charged is enumerated in § 3142(f)(1)(B), since it is an

---

³ *See also Andrewsh*, 2020 WL 1904473, at *4 (same); *Hussein*, 2020 WL 1853656, at *4 (same); *United States v. Huan*, No. 3:20-CR-24, 2020 WL 1847063, at *3 (E.D. Tenn. Apr. 10, 2020) (same); *United States v. Hamlin*, No. 17-cr-175, 2020 WL 1703848, at *5 (E.D. Wis. Apr. 8, 2020) (same); *Hanson*, 2020 WL 1692967, at *2 (same).

offense for which the maximum sentence is life imprisonment. The offense also arguably involves a firearm, which provides a separate ground for detention under Section 3142(f)(1)(E). Moreover, § 3142(f)(2) also allows for a detention hearing when (as here) there is "serious risk" the defendant "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

After the initial detention hearing in this case, the Court found that the government met its burden of showing by clear and convincing evidence that there were no conditions or combination of conditions that could reasonably assure the safety of the community, or any other person. (ECF. No. 25). The portion of Carrington's argument that goes most directly to reevaluation of this conclusion asserts that she now has "a powerful incentive to abide by any release conditions the Court may impose" due to the fact that she feels her life, not just her liberty, are at stake. (ECF No. 83, at 6). The Court is mindful that it must consider possible conditions, or combinations of conditions, of release. § 3142(f). Carrington's state of mind is no doubt relevant to whether she would abide by any conditions of release. This increased incentive to abide by terms of release certainly has a bearing upon both the ultimate question of whether any condition or combination of conditions could reasonably assure the safety of the community or any other person, and the factors under § 3142(g), such as Carrington's history and characteristics.

At the same time, the changed circumstances also may increase the danger Carrington poses to the community or any other person, a factor for consideration under § 3142(g). As the facts outlined above show, the central danger Carrington poses is to any witness that may testify against her or her family members. The allegations against Carrington suggest she attacked the very functioning of the judicial system, and did so with one of her sons, who was on such strict conditions of release that he was wearing an ankle monitor. Any increase in Carrington's incentive

13

to abide by the terms of release must be considered in connection with her prior incentive to attack a victim-witness, and the allegation that she actually took such action. As discussed above, the victim in this case knew Carrington well and the allegations are that the victim was attacked while walking home from work. (ECF. No. 1-1, ¶¶ 5, 10). It is hard to see how that victim is any safer while COVID-19, at least for the time being, will increase the amount of time the victim remains in a single location: her home. Any degree to which a change in Carrington's mindset increases her likelihood to abide by conditions of release is offset by the corresponding danger she may commit acts akin to those contained in the criminal Complaint. Accordingly, the Court's original balancing of the factors it must consider at a detention hearing remains unchanged.

While it is unnecessary to delve into all of the other factors that originally called for detention, the Court will briefly summarize its rationale for finding that there are no conditions or combination of conditions that could reasonably assure the safety of the community, or the victim in this case. The Court considered, and the parties argued, all the factors set forth in under § 3142(g), but there was some focus at the original detention hearing on the strength of the government's case. The case does largely rise and fall on one witness's testimony. However, that testimony is corroborated by physical evidence such as dried blood, duct tape, and the location of Jarod's ankle monitor. And the victim had ample opportunity to see her assailants, her attention was certainly heightened by her kidnapping, and she has not manifested any doubt as to the identity of the kidnappers, who she knew well. This Court relied upon the strength of the case as a factor in the government's favor when making its initial determination on the issue of detention, and nothing has changed. (ECF. No. 71, at 18 ("The weight of the evidence against the defendant, I do think, is relatively strong and cuts in the government's favor as well.")).[4]

---

[4] While not directly relevant in that the evidence against each defendant is viewed separately, this issue was also found to weigh in favor of detention for Jaron Johnson. (ECF No. 56, at 4).

Carrington's history and characteristics also weigh in favor of detention. Some courts "consider both actual convictions and mere arrests or indictments to assess the defendant's dangerousness." *United States v. Tolbert*, No. 3:09-CR-56, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017). Even when courts do consider mere arrests, they typically place less weight upon them. *Id.* In this instance, the Court places no weight on the uncharged conduct and does not rely upon it for purposes of today's analysis. However, in view of the allegations against Carrington, the lack of serious *prior* criminal history does little to provide comfort that conditions of release could reasonably mitigate the danger she poses to the community, and the victim in this case. Carrington's ties to the community helps provide grounds to believe she will appear as required, but the Court's denial of bond was based solely upon danger to the community. (ECF No. 25).

The nature and circumstances of the offense charged and the nature and seriousness of the danger to the victim, other witness, and the community, weighed most heavily in favor of detention, and continue to do so. It is hard to see how conditions of release would mean a great deal to anyone willing to attack the functioning of the judicial system though a kidnapping aimed at silencing a witness. Carrington is presumed innocent, of course, yet the Court must consider these factors. § 3142(g)(1) and (4). While some factors may cut in Carrington's favor (she was not on bond or release pending trial at the time of the offense), the case for detention remains strong.

### III.   Section 3142(i)

Since § 3142(f) still calls for detention, the Court will turn to § 3142(i). As discussed above, under § 3142(i), a court may permit the "temporary release" of a defendant detained under the Bail Reform Act to the custody of a United States Marshal "or another appropriate person" when doing

15

so is "necessary" for a "compelling reason." In looking to this section in light of COVID-19 concerns, many courts consider the *Clark* factors: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others." *Davis*, 2020 WL 1951652, at *1.

The *Clark* factors track considerations tied to the text of the statute. The first factor, the original grounds for detention, considers whether the reasons a defendant seeks release are compelling in light of the strength of the case for detention. The original grounds for Carrington's detention are discussed above and counsel very strongly for continued detention given Carrington's danger to the community. There is no doubt that COVID-19 in a prison facility is an extremely unfortunate situation. The Court views this, however, in relation to the original grounds for detention. Carrington's underlying conditions and her positive test for COVID-19 require careful consideration of whether she is receiving the medical care she deserves. However, as discussed below, even though Carrington's need for medical care must be considered, the Court must determine whether her release is necessary for that reason.

As the second *Clark* factor points out, the Court needs to look at the specificity of Carrington's COVID-19 concerns. Here, Carrington's specific concern is medical care. At the Porter County Jail, a nurse is on call 24 hours a day, 7 days a week, Carrington is checked twice a day. The jail can check Carrington's oxygen levels on-site. Should Carrington's condition take an unfortunate turn for the worse, the jail also has supplemental oxygen. Carrington's room has an intercom system where she can call for help at any time. In the one instance where a detainee did need to go to hospital, they were able to do so without incident. Carrington asks whether the jail

has a ventilator, but that would only carry relevance if Carrington sought release to a location that had a ventilator, or for that matter was showing symptoms suggesting the need for such a device. Yet Carrington does not suggest that anyone who would live with her upon release has any medical training, or that she would in any way receive medical care better than that which is currently provided for her.[5] Under her proposed terms of release, Carrington would presumably have to leave her sister's home to meet with a health care provider in person or receive supplemental oxygen. Those options are currently available to her on-site at the Porter County Jail. It is hard to see how Carrington's specific concerns make release *necessary* for the purpose of receiving adequate medical care.[6]

The third and forth *Clark* factors seek to measure how release would mitigate, or increase, risks posed by COVID-19. Carrington has COVID-19 so release cannot mitigate her exposure to it, and the risk of complications due to COVID-19 are addressed through medical care. At the same time, Carrington's release would significantly increase the risk of transmission to her sister, brother-in-law, and nephew.

Another statutory term, which may not fit squarely into any one *Clark* factor, is the requirement that a defendant be released to the U.S. Marshal, or "another appropriate person." § 3142(i). At least one decision has suggested that an "appropriate person" might consist solely of law enforcement personnel. *United States v. Leake*, 2020 WL 1905150, at *4 (defendant's motion did "little to establish that this proposed custodian is 'appropriate' in terms of actually being qualified to be given such responsibility"). The Court does not deem it necessary to delve

---

[5] In any event, as other decisions have observed, if issues arise as to the adequacy of Carrington's medical care, the solution is to address her conditions of detention, not release her. *See United States v. Duckett*, No. 19 CR 229, 2020 WL 1904745, at *6 (D. Md. Apr. 17, 2020); *United States v. Bilbrough*, No. 20-33, 2020 WL 1694362, at *4 (D. Md. Apr. 7, 2020).

[6] It is also unclear if Carrington would have the ability to treat the mental health issues pointed out by the government upon release. (ECF No. 93, at 6).

17

into this issue too deeply given its other findings, but nevertheless notes that there is no indication Carrington is seeking release to either a law enforcement officer, or even anyone with medical training sufficient to provide any care she may need, much less better care than she is currently receiving.

While Carrington is entitled to an individualized determination, as the Court just provided above, it is worth noting at least two courts have denied motions for temporary release under § 3142(i) where the defendant was infected with COVID-19: *United States v. Cook*, 2020 WL 1939612 (M.D. Penn. Apr. 22, 2020); *United States v. West*, 2020 WL 1638840 (D. Md. Apr. 2, 2020). One of these (*Cook*) involved a defendant with higher risk medical conditions (a heart condition and history of pneumonia). Both decisions denied release for similar reasons: the original grounds for detention were still strong; the defendant proposed no plan for health care upon release and cited no evidence that healthcare would be better out of custody; and the defendant's release would risk community spread of COVID-19, especially if released on home detention with others in the home. The same reasons apply here.

## CONCLUSION

COVID-19 brings truly awful consequences for many. The Court takes Carrington's concerns seriously and, as stated at the hearing on this matter, is requiring that defense counsel receive daily updates on Carrington's status, and more immediate notification of any decline in her condition. (ECF No. 97). The Court's review of the statutory criteria Carrington must meet for release should not obscure the fact that she is facing a virus that is often quite serious, and even deadly. Carrington is entitled to medical care as she confronts this challenge. Yesterday's hearing showed that Carrington's release is not necessary for her to receive that medical care.

For the foregoing reasons, the Court hereby **GRANTS** Defendant Patricia Carrington's Motion to Reconsider Bond [DE 83] and reconsiders the Court's prior Order of Detention [DE 25] based on the evidence and arguments identified in Defendant's Motion, the parties' briefing, and the April 27, 2020 video teleconference hearing, but **DENIES** Defendant's request for release under 28 U.S.C. 3142(f) and (i).

So ORDERED this 28th day of April, 2020.

> s/ Joshua P. Kolar
> MAGISTRATE JUDGE JOSHUA P. KOLAR
> UNITED STATES DISTRICT COURT